## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEITH K. KRUCHTEN, ANGEL D. MURATALLA and WILLIAM BEGANI, individually and on behalf of all others similarly situated, | ) ) ) ) | **CIVIL ACTION NO.** 2:22-cv-00678-JS |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| RICOH USA, INC., THE BOARD OF DIRECTORS OF RICOH USA, INC., THE RICOH RETIREMENT PLANS COMMITTEEE and JOHN DOES 1-30. | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

### SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Keith K. Kruchten, Angel D. Muratalla and William Begani, ("Plaintiffs"), by and through their attorneys, on behalf of the Ricoh USA, Inc. Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Ricoh USA, Inc. ("Ricoh" or "Company"), the Board of Directors of Ricoh USA, Inc. and its members during the Class Period ("Board")[2], and the Ricoh Retirement Plans Committee and its members during the Class Period ("Committee").

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] As will be discussed in more detail below, the Class Period is defined as February 22, 2016 through the date of judgment ("Class Period").

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees,*" *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

6.    Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.    The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

8.    Because cost-conscious management is fundamental to prudence in the investment function the concept applies to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees.

9.    At all times during the Class Period, the Plan had at least $1.9 billion dollars in assets under management.  At the Plan's fiscal year end in 2020 and 2019, the Plan had over $2.1 billion dollars and $2 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of Independent Auditor of the Ricoh USA, Inc. Retirement Savings Plan ("2020 Auditor Report") at 3.

10.    The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     The Plan is also large in terms of the number of its participants.  From 2016 to 2020, the Plan had between 18,619 and 25,592 participants with account balances. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 198 defined contribution plans (401k, 401a, and 403b) in the country with 15,000 to 19,999 participants with account balances.  And there were only 194 plans in the country with between 20,000 and 29,999 participants with account balances.  Accordingly, the Plan had substantial bargaining power to negotiate favorable recordkeeping and administration fees.

12.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) failing to control the Plan's recordkeeping administration ("RKA") costs.

13.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

### IV.   JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

16.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## V.    PARTIES

### **Plaintiffs**

18.    Plaintiff, Keith K. Kruchten ("Kruchten"), resides in Lisle, Illinois. During his employment, Plaintiff Kruchten participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs which were, in part, charged as a fee against all investments in the Plan, as discussed below. Specifically, Plaintiff Kruchten invested in, but not limited to, the American Funds EuroPacific Growth Fund, the Vanguard Total Stock Market Index Fund which, as discussed in more detail below, were subject to a 9 basis point asset charge to pay for unreasonably high RKA costs.  Plaintiff Kruchten suffered injury to his Plan account by overpaying for his share of administration and recordkeeping costs.

19.    Plaintiff, Angel D. Muratalla ("Muratalla"), resides in Hawthorne, California. During his employment, Plaintiff Muratalla participated in the Plan investing in the options offered by the Plan and was subject to the excessive administration and recordkeeping costs which were, in part, charged as a fee against all investments in the Plan, as discussed below. Specifically, Plaintiff Muratalla invested in, but not limited to, the Vanguard Total Stock Market Index Fund which, as discussed in more detail below, was subject to a 9 basis point asset charge to pay for

unreasonably high RKA costs. Plaintiff Muratalla suffered injury to her Plan account by overpaying for her share of administration and recordkeeping costs.

20.    Plaintiff, William Begani ("Begani"), resides in Forest Park, Illinois. During his employment, Plaintiff Begani participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs which were, in part, charged as a fee against all investments in the Plan, as alleged below. Specifically, Plaintiff Begani invested in, but not limited to, the BlackRock LifePath 2050 fund, the American Funds EuroPacific Growth Fund, Vanguard Total International Stock Index and the Vanguard Global Equity Fund, all of which, as discussed in more detail below, were subject to a 9 basis point asset charge to pay for unreasonably high RKA costs. In addition, Plaintiff Begani invested in the Dodge and Cox International Stock Fund and the T. Rowe Equity Income Fund, discussed below, which shared revenue with the Plan's recordkeeper, Alight, to pay for the already high RKA costs. Accordingly, Plaintiff Begani suffered injury to his Plan account by overpaying for his share of RKA costs and having revenue sharing extracted from his investments which in turn was used to pay the already high RKA costs.

21.    Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

22.    Plaintiffs did not have knowledge of all material facts (including, among other things, total plan recordkeeping and administration cost comparisons to similarly-sized plans or information regarding other available funds) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

23.     Ricoh is the Plan sponsor and a named fiduciary with a principal place of business being 300 Eagleview Boulevard, Suite 200, Exton, Pennsylvania. The December 31, 2020 Form 5500 of the Ricoh USA, Inc. Retirement Savings Plan filed with the United States Department of Labor ("2020 Form 5500") at 1. Ricoh describes itself as "an information management and digital services company connecting technology, processes, and people. As part of a global leader, we create competitive advantage for over 1.4 million businesses and solve problems for companies large and small. Every day our more than 90,000 global employees serve a vast array of industries designing and optimizing end-to-end business solutions.[4]"

24.     Ricoh appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. The Ricoh USA, Inc. Retirement Savings Plan, as amended and restated, effective July 1, 2021 ("Plan Doc.") at 13 and 70. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25.     Accordingly, Ricoh during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

---

[4] https://www.linkedin.com/company/ricoh-company-ltd- last accessed on January 28, 2022.

**Board Defendants**

26.    Ricoh, acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. Plan Doc at 13 and 76. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27.    Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

28.    The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

29.    A discussed above, Ricoh, acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. Plan Doc at 13 and 76.

30.    As stated in the Plan Doc., the Committee "shall be the named fiduciary with respect to the investment of Plan assets and the selection and ongoing monitoring of Investment Funds to which Participants may direct their accounts." Plan Doc. at 76. As will be discussed below, the Committee fell well short of these goals as a fiduciary to plan participants.

31.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

32.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

33.     To the extent that there are additional officers, employees and/or contractors of Ricoh who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Ricoh officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## VI.   CLASS ACTION ALLEGATIONS[5]

34.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the

---

[5] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Plan, at any time between February 22, 2016, through the date of judgment (the "Class Period").

35. The members of the Class are so numerous that joinder of all members is impractical. The 2020 Form 5500 lists 18,619 Plan "participants with account balances as of the end of the plan year." 2020 Form 5500 at 2.

36. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

37. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plan;

B. Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C. Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

38. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have

no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

39.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

40.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.    THE PLAN

41.     The Plan is a defined contribution plan covering substantially all eligible employees of Ricoh. 2020 Auditor Report at 5. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. The Ricoh USA, INC. Retirement Savings Plan as amended and restated, effective July 1, 2021 ("Plan Doc.") at 38.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

11

*Eligibility*

42.    In general, the Plan covers all full-time and part-time employees of the Ricoh. 2020 Auditor Report at 5.

*Contributions*

43.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. 2020 Auditor Report at 5.

44.    With regard to employee contributions, participants can elect to make annual pre-tax and Roth contributions subject to Internal Revenue Service ('IRS') limitations. *Id*. With regard to matching contributions made by Ricoh, Ricoh does provide a contribution of a portion of eligible compensation. *Id.* As detailed in the 2020 Auditor Report, Ricoh will contribute 50% of participants' basic contributions. *Id.* Basic contributions are defined as "contributions of up to the first 6% of the participant's compensation, for a maximum match of 3%." *Id.*

45.    Like other companies that sponsor 401(k) plans for their employees, Ricoh enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

46.    Ricoh also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

12

47.     Given the size of the Plan, Ricoh likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

48.     With regard to contributions made by participants to the Plan, such contributions vest immediately. 2020 Auditor Report at 6. Generally, contributions made by Ricoh prior to July 1, 2014 are subject to a five-year vesting schedule. *Id*. However, contributions made after July 1, 2014 are immediately vested. *Id*.

*The Plan's Investments*

49.     In theory, the Committee determines the appropriateness of the Plan's investment offerings, monitors investment performance and reviews total plan and fund costs each year. Plan Doc. at 70. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

50.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

51.     The Plan's assets under management for all funds as of December 31, 2020 was $2,141,993,139.  2020 Auditor Report at 3.

*Payment of Plan Expenses*

52.     During the Class Period, administrative and recordkeeping expenses were generally paid using a combination of charges to the participants and Plan assets. 2020 Auditor Report at 9.

VIII.   **THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE**

53.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

13

54.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 2022 WL 19935, at *3.

55.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[7]

### A.     ERISA's Fee Disclosure Rule

56.     In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [8]

57.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

58.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that

---

[7] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.
[8] *See https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf* ("DOL 408(b)(2) Regulation Fact Sheet")

14

arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."  DOL 408(b)(2) Regulation Fact Sheet.

59.    The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

60.    A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

61.    Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants.  Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)."  29 CFR § 2550.404a-5(C)(2)(ii)(B).

**B.    Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants**

62.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

63.    There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan).  First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet

style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Recordkeeping;

B. Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C. Administrative services related to converting a plan from one recordkeeper to another;

D. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E. Maintenance of an employer stock fund (if needed);

F. Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G. Plan consulting services, including assistance in selecting the investment lineup offered to participants;

H. Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[9] (excluding the separate fee charged by an independent third-party auditor);

I. Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

---

[9]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

J.  Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

64.    This suite of essential recordkeeping services can be referred to as "Bundled" services.  These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

65.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants.  These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte services typically include, but are not limited to, the following:

A.  Loan processing;

B.  Brokerage services/account maintenance (if offered by the plan);

C.  Distribution services; and

D.  Processing of qualified domestic relations orders.

66.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

67.    The cost of providing recordkeeping services often depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  *See* 1998 DOL Study at 4.2.2

("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."[10]  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

68.    In general, the level, number and character of participant services provided by the record keeper have minimal impact upon the costs of providing record keeping.  That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs.  Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

69.    The incremental costs caused by additional participants may include: Mailing costs, if materials are delivered by mail versus Internet; telephone inquiries through an 800 number; check distributions from the 401(k) plan to the participant; and/or any in person or off line participant education and investment guidance requiring the personnel time of a record keepers staff member.  This service is normally charged as an additional line-item cost.

70.    Although the 401(k) participant servicing can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan.  ***Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.***

71.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by

---

[10] *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

  **C.**  **Much Information Regarding the Reasonableness of Fees for Services Are in the Sole Possession of Defendants**

72. As noted above, 408(b)(2) disclosures provided to plan sponsors and fiduciaries are generally not made available to plan participants.  The same is true for Plaintiffs and this Plan, as Plaintiffs do not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

73. Other information has also not been made available to Plaintiffs.  For example, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

74. Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two

years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[11]

75.    Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information.

76.    Additionally, documentation of fiduciary reviews is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions. Any related documents or data considered for purposes of the investment review (*e.g.*, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized. Without proper documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

77.    In an attempt to discover the details of the Plan's mismanagement, on October 11, 2021, Plaintiffs wrote to Ricoh requesting, *inter alia*, meeting minutes from the Committee. By correspondence dated November 10, 2021, Ricoh denied this request.

78.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to

___

[11] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote, et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

79.     In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

80.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

**D.      Circumstantial Facts Plausibly Showing the Plan Paid Unreasonable Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Fees**

**1.      Several Funds Were More Expensive than Comparable Funds Found in Similarly-sized Plans**

81.     Defendants did not adhere to fiduciary best practices to control Plan costs when looking at certain aspects of the Plan's administration such as monitoring investment management fees for the Plan's investments, resulting in several funds during the Class Period being more expensive than comparable funds found in similarly sized plans (conservatively, plans having over 1 billion dollars in assets).

82.     With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of

assets. For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets. However, the expense ratio also reduces the participant's return and the compounding effect of that return. This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

83.    The expense ratios for the Plan were artificially high to pay for the plan's excessive administration and recordkeeping fees, which is the crux of this lawsuit, and will be discussed below. The Defendants chose to add 9 basis points to each fund in the Plan to offset the Plan's administration and recordkeeping costs. *See,* the Annual Fee Disclosure Statement of the Ricoh USA, Inc. Retirement Savings Plan dated January 20, 2021 ("Fee Disclosure") at 2. Even a fund which would have a normally low expense ratio such as a Vanguard index fund, would be considered to have excessive expense ratios after these 9 basis points are applied. For example, throughout the Class Period, the Plan had the Vanguard Total Stock Market Index fund. In 2021 this fund reported an expense ratio of 0.14% which is well above the ICI median of .04% for index funds.[12] Similar results are seen for all the funds in the Plan when the 9 basis points are added to each funds normal expense ratio.

84.    The addition of the 9 basis points to each fund to pay for administration and recordkeeping costs meant these costs were excessively high, thus strongly suggesting that the Defendants failed to engage in an appropriate prudent process when selecting the funds and a fee structure for the Plan.

---

[12] *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2018* at 55 (July 2021) (hereafter, "ICI Study") available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf

**2.      There is No Indication Defendants Conducted FRPs at Reasonable Intervals**

85.      As noted above, 408(b)(2) disclosures are not available to plan participants.  By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either.  Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP.

86.      Here, from all indications, the Plan paid yearly amounts in recordkeeping fees that were well above industry standards each year over the Class Period.

87.      For this reason, there is little to suggest that Defendants conducted an appropriate RFP at reasonable intervals – or certainly at any time prior to 2016 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.[13]

88.      In 2020, Alight, was in the top 10 of recordkeepers as measured by assets being recordkept:

2020 TOP PROVIDERS (RECORDKEEPERS)[14]

**Top 10, by Total 401(k) Assets ($MM)**

| | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |

---

[13] Although the Plan's recordkeeper changed from Hewitt Associates to Alight in 2017, there's little to suggest such a change resulted in lower fees to Plan participants as there was no significant reduction in fees charged. It appears that Hewitt used a similar methodology to that of Alight where it seems 9 basis points had been charged from 2017 to 2020. As indicated below, upon information and belief, Hewitt was acquired by Alight in 2017 so they are essentially one and the same entity.

[14] *See https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/*

| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

89.     At any point in the Class Period, the Plan's fiduciaries could have opted to conduct a RFP including any of the above recordkeepers who were peers of Alight and capable of providing lower recordkeeping fees as will be shown below.

90.     The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena.

### 3.     Market Surveys, Form 5500s and other Sources Are a Reliable Source for Participants to Determine Whether The Plan's Recordkeeping Fees Are Unreasonable

91.     As mentioned above, description of plan services and costs are provided to plan fiduciaries via 408(b)(2) disclosures and to plan participants via 404(a) disclosures.  The 404(a) disclosure provided by Ricoh in 2021 stated vaguely with regard to recordkeeping and administrative services that administrative fees "include trustee, legal, accounting, recordkeeping and other fees and expenses associated with maintaining the Plan."

92.     It further stated "[a]ny participant with a balance in the RSP that is not an active employee with Ricoh USA, Inc., or its affiliates will be charged a quarterly recordkeeping of $10.46 which will be deducted pro-rata from their RSP account balance."

93.     This means at minimum, recordkeeping costs were $42 per year in 2021 and likely higher prior to 2021.  When other administrative fees are added, the cost of RKA soared beyond that amount.  As detailed in the January 2021 Fee Disclosure, "the Plan is charged fees for Plan services, such as trustee, legal, recordkeeping, and accounting services.  The Plan offsets these fees by adding a 0.09% administration fee to each of the investment options in the Plan." Annual Fee Disclosure Statement of the Ricoh USA, Inc. Retirement Savings Plan dated January 20, 2021

("Fee Disclosure").  The Fee Disclosure goes on to say that "[y]ou won't see these fees directly because they are charged to plan investment options and reduce your investment earnings." Fee Disclosure at 1

94.     Here, the Defendants chose to add a 9 basis point charge assessed to all the funds in the Plan available for investment by participants and to have some funds pay revenue sharing to cover the cost of RKA fees.  The 9 basis point charge is in addition to revenue sharing received through both the Dodge and Cox International Stock Fund and the T. Rowe Equity Income Fund which were funds invested in by at least of one of the Plaintiffs here. The Dodge and Cox fund added an additional 10 basis points and the T.Rowe fund added an additional 15 basis points to pay for RKA fees which only confirms the RKA is wholly excessive.

95.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."   Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

96.     Given the vague description of services provided in the 404(a) disclosures, it is plain that the Plan's recordkeepers provided services that fell within the broad range of services described above.  The Plan did not receive specialized services outside the range typical of services received by other plan's its size that would justify excessive fees.

97.     Accordingly, Plaintiffs looked to other publicly available sources to make a reasonable comparison to determine whether the Plan's fiduciaries were overpaying for RKA.

25

*Unreasonable Use of Revenue Sharing to Pay for RKA*

98.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

99.    In this matter, using revenue sharing to potentially cover additional fees resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping and administration fees. The Plan's fiduciaries decided to pay for administration and recordkeeping in this case by adding 9 basis points to the expense ratio of each fund in the Plan and added additional revenue sharing to the Dodge and Cox International Stock Fund and the T. Rowe Equity Income Fund discussed above. This had a devastating effect on plan participants because as the assets in the Plan increased the recordkeeping and administration charges increased exponentially. *See,* the Fee Disclosure at 2.

100.    The addition of this 0.09% administration fee to each investment in the Plan severely reduced the participants earning potential as the ultimate fees charged were excessive when compared to other plans of similar size.

101.    Looking at all the years during the Class Period, it's clear these unreasonably high recordkeeping and administration costs continued throughout the Class Period. As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were significantly above market rates when benchmarked against similar plans.

|  | **Participants** | **Total Direct Comp to RK**[15] | **RK Indirect**[16] | **Total Comp** | **$PP** |
|---|---|---|---|---|---|
| 2016 | 25,592 | $2,119,261 | $228,151.94 | $2,347,412.94 | $91.72 |
| 2017 | 23,926 | $1,513,219 | $178,457.00 | $1,691,676.00 | $70.70 |
| 2018 | 22,575 | $1,206,046 | $187,921.61 | $1,393,967.61 | $61.75 |
| 2019 | 20,733 | $1,570,680 | $215,197.56 | $1,785,877.56 | $86.14 |
| 2020 | 18,619 | $1,751,586 | $176,207.73 | $1,927,793.73 | $103.54 |

102.    The devastating effect of charging an unchecked 9 basis points for recordkeeping and administration fees is seen clearly here. As detailed above, the per participant charge ranged from a high of $103 per participant in 2020 to a low of $61 per participant in 2018. The per participant fees steadily increased from 2018 to 2020 as the assets of the plan grew but the number of participants actually declined. A prudent fiduciary would have understood these fees to be excessive and taken corrective action by seeking lower cost administrative and recordkeeping alternatives.

***Comparison to Similarly Situated Plans***

103.    By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

104.    At all times during the Class Period, the Plan had over 18,000 participants and over $1.9 billion dollars in assets under management. As of 2020, the Plan had over 18,619 participants and over $2.1 billion dollars in assets under management making it eligible for some of the lowest fees on the market.

---

[15] No direct payment was reported to the Plan's recordkeeper in 2020. However, this amount is estimated by multiplying total assets in 2020 by the 9 basis points charged against all funds in the Plan, adding indirect costs and subtracting amounts reported as fees paid to the Trustee. The actual amount is likely higher since additional revenue sharing may be revealed during discovery.

[16] This number is derived by calculating the additional revenue sharing for the Dodge and Cox International Stock Fund and the T. Rowe Equity Income Fund which is 10 basis points and 15 basis points, respectively.

105. As noted above, in 2020, there were only 198 defined contribution plans (401k, 401a, and 403b) in the country with 15,000 to 19,999 participants with account balances. And there were only 194 plans in the country with between 20,000 and 29,999 participants with account balances. All plans above 10,000 participants require the same level of plan and participant record keeping and servicing.

106. As also noted above, at least from the beginning of the Class Period up until 2017, Hewitt Associates was the Plan's recordkeeper. Alight has been the Plan's recordkeeper from 2017 to, at least, 2020.[17]

107. Looking at recordkeeping costs for other plans of a similar size in 2019 shows that the Plan was paying higher recordkeeping administration fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.

108. The chart below analyzes fees paid in certain years to recordkeepers within Alight's peer group (*i.e.* those recordkeepers in the top ten based on assets under management) for RKA provided to plans of similar size to the Plan. The fees below are derived from publicly available form 5500s. The fees paid by these plans confirm that the Plan's fiduciaries could have obtained these same fees if they conducted a RFP or took other prudent steps to manage the Plan's costs.

109. As noted above, the DOL has opined that per-participant administrative charges reflect sliding scales that substantially reduce per capita costs as plan size increases. That clearly was not the case for the Plan.

110. The comparable plans analyzed below have at minimum 13,000 participants and more than $300 million dollars in assets under management:

---

[17] Upon information and belief Hewitt was incorporated into Alight in May 2017.

| Comparable Plans' R&A Fees Paid | | | | |
|---|---|---|---|---|
| Plan Name | Partici-pants[18] | Assets Under Management[19] | RK&A Costs /pp[20] | Record-keeper |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | **$35** | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | **$35** | Fidelity |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | **$33** | Fidelity |
| Fedex Office and Print Services, Inc. 401(k) Retirement Savings Plan | 17,652 | $770,290,165 | **$30** | Vanguard |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,552,720,874 | **$23** | T.Rowe Price |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | **$33** | Alight |

111.    More examples abound of other same-sized or smaller plans paying much less for

RKA costs during the same time period while utilizing recordkeepers in Alight's peer group:

| Year | Plan Name | Assets | Participants | Part Fee | Recordkeeper |
|---|---|---|---|---|---|
| 2018 | Bausch Health Companies Inc. Retirement Savings Plan | $904,717,349 | 8,902 | $36 | Fidelity |
| 2018 | Children's Medical Center of Dallas Employee Savings Plan 403(b) | $349,335,673 | 9,356 | $36 | Fidelity |

---

[18] Participants are taken from the 2018 Form 5500 using the conservative number of only those participants with account balances at the year-end which is the typical figure used to determine RKA costs.

[19] Assets under management are taken from the 2018 Form 5500 using the more conservative number found in the accompanying audited financial statements. In some cases, this number may be understated minimally to account for differences in auditing practices.

[20] Per participant costs are calculated using amounts reported on the 2018 5500 as direct cost and indirect costs on the Schedule C and coded as recordkeeping and administration unless otherwise noted.

| Year | Plan Name | Assets | Participants | Part Fee | Recordkeeper |
|---|---|---|---|---|---|
| 2018 | Ralph Lauren 401(k) Plan | $552,586,935 | 9,389 | $31 | T.Rowe |
| 2018 | Southern California Permanente Medical Group Tax Savings Retirement Plan | $773,795,904 | 10,770 | $31 | Vanguard |
| 2019 | Pacific Architects and Engineers, LLC 401(k) Savings Plan | $435,391,716 | 14,698 | $23 | Fidelity |
| 2019 | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | $939,399,569 | 18,674 | $25 | Vanguard |
| 2019 | First American Financial Corporation 401(K) Savings Plan | $1,791,281,396 | 15,246 | $35 | Fidelity |
| 2019 | Michelin 401(k) Savings Plan | $2,817,613,558 | 16,335 | $36 | Vanguard |

### *The Fidelity Stipulation*

112.    Fidelity, within Alight's peer group as described above, became the Plan's recordkeeper in 2021 according to Defendants.

113.    In a recent lawsuit where Fidelity's multi-billion dollar plan with tens of thousands of participants like the Plan was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per

person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

114.     Specifically, Fidelity stipulated as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that **Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year**. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. **The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).**

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

115.     The significance of the Fidelity stipulation is that the Plan's demographics matches favorably with the Fidelity plan's demographics demonstrating the Plan fiduciaries could have negotiated for RKA fees as low $14 and up to $21 per participant.

### *Market Surveys Demonstrate the Unreasonableness of the Plan's RKA Fees*

116.     One final piece of data that underscores the unreasonableness of the RKA costs in this case is data released by NEPC, a consulting group. In its 15th Annual Survey titled the NEPC 2020 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees,[21] the NEPC analyzed the prudence of offering administration and recordkeeping as a percentage of assets. As discussed above, the Plan used 0.9% of total plan assets to pay for administration and recordkeeping. The NEPC study found that the median plan with over 15,000

---

[21] Available at
https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf

participants paid no more than .04% of plan assets. In other words, the Plan was paying 125% more than the median Plan in the study.

117.    Another source confirms the unreasonableness of the Plan's total recordkeeping and administration costs.  Some authorities cited in case law dating as far back as six years ago recognized that reasonable rates for jumbo plans typically average around $35 per participant, with costs coming down every day[22].

118.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.  The Plan, with over 18,000 participants and over $2 billion dollars in assets in 2020 as an exemplar year typical of each year of the Class Period, should have been able to negotiate a recordkeeping cost anywhere from $14 per participant to a high of $35 from the beginning of the Class Period to the present.

119.    Indeed, the recordkeeping services obtainable from Alight (and its predecessor), as well as other national recordkeepers, have been the same or materially similar since 2014 meaning that the Plan could have achieved similar pricing in each year since the start of the Class Period in 2016.

---

[22] Case law is in accord that large plans can bargain for low recordkeeping fees. *See, e.g., Spano v. Boeing,* Case 06-743, Doc. 446, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37-$42, supported by defendants' consultant's stated market rate of $30.42-$45.42 and defendant obtaining fees of $32 after the class period); *Spano,* Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20-$27 and plan paid recork-keeper $43-$65); *Gordon v. Mass Mutual*, Case 13-30184; Doc. 107-2 at 10.4 (D.Mass. June 15, 2016). (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

120.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

121.    At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

122.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

123.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint, such as failing to make decisions regarding the Plan's recordkeeping and administration fees.

124.    The failure to engage in an appropriate and prudent process resulted in saddling the Plan and its participants with excessive Plan recordkeeping and administration costs.

125.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

126.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must

restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

127.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Ricoh and the Board Defendants)**

128.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

129.    Ricoh and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

130.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

131.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

132.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which Plan investments were evaluated; and

(c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan and pay exorbitant fees for the Plan's recordkeeping and administration, all to the detriment of the Plan and Plan participants' retirement savings.

133.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

134.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

36

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated:  December 27, 2022            **CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey
Donald R. Reavey, Esquire
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
Email: donr@capozziadler.com
Telephone: (717) 233-4101
Fax: (717) 233-4103

/s/ Mark K. Gyandoh
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email:  markg@capozziadler.com
Telephone: (610) 890-0200
Fax: (717) 233-4103

Counsel for Plaintiffs and the Putative Class

37

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 27, 2022 a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

/s/ *Donald R. Reavey*
Donald R. Reavey